COURT OF APPEALS OF VIRGINIA

Present:    Judges Petty, Russell and Malveaux
Argued at Richmond, Virginia

SHENG JIE JIN

                                                              OPINION BY
v.         Record No. 0457-16-2                    JUDGE WILLIAM G. PETTY
                                                              FEBRUARY 14, 2017

COMMONWEALTH OF VIRGINIA

          FROM THE CIRCUIT COURT OF NEW KENT COUNTY
                         B. Elliott Bondurant, Judge

          Kelsey Peregoy (Jonathan P. Sheldon; Sheldon, Flood & Haywood,
          P.L.C., on brief), for appellant.

          Aaron J. Campbell, Assistant Attorney General (Mark R. Herring,
          Attorney General; Susan Baumgartner, Assistant Attorney General,
          on brief), for appellee.


          Sheng Jie Jin was convicted, after a bench trial, of two counts of attempted first-degree

murder in violation of Code §§ 18.2-32 and 18.2-26 and two counts of aggravated malicious

wounding in violation of Code § 18.2-51.2.  He argues that his convictions should be reversed

for two reasons.  First, Jin argues the trial court violated his double jeopardy rights by convicting

him of two counts of attempted murder when his acts were part of one continuing offense.

Second, Jin argues that the trial court erred when it limited his cross-examination, which was

intended to show bias on the part of the Commonwealth's witness.  We conclude that the

evidence supported the trial court's factual finding that the two attacks constituted two separate

offenses and that Jin's double jeopardy rights were therefore not implicated.  We further

conclude that the trial court did not abuse its discretion when it sustained the Commonwealth's

objection on relevancy grounds to one question that was, at most, only marginally relevant.

Accordingly, we affirm the convictions.

PUBLISHED

I. BACKGROUND

"Under well-settled principles of appellate review, we consider the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party in the circuit court." Porter v. Commonwealth, 276 Va. 203, 215-16, 661 S.E.2d 415, 419 (2008).[1]

Jin and his wife, Y.Y.Z., married in China in 1993. In roughly 2009, Jin and Y.Y.Z. started a restaurant together in New Kent County. The couple separated in 2011, and Jin moved to Northern Virginia to establish a new restaurant. In 2012, Y.Y.Z. obtained a divorce decree from a Nevada court, but Jin successfully had the decree set aside in 2014. During this time, Y.Y.Z. continued to live in New Kent County and continued to run the restaurant there. Y.Y.Z.'s brother (the brother) and his wife worked in Y.Y.Z.'s restaurant. Additionally, the brother, his family, and another restaurant worker lived with Y.Y.Z. and her children. Jin stayed at the house on occasion and had some contact with the couple's children.

On the evening of January 20, 2015, Jin entered the restaurant in New Kent County and began arguing with Y.Y.Z. in the kitchen area. When Jin and Y.Y.Z. began arguing, the brother was not present, but his spouse heard the argument and testified that the argument included the topics of money and divorce. The brother testified that when he returned he saw Jin holding a knife in the kitchen and heard Jin say to Y.Y.Z., "I will kill you." When the brother told Y.Y.Z.

---

[1] In this case, an interpreter translated the proceedings into the appropriate Chinese dialect for the benefit of Jin. The interpreter also translated on behalf of several Chinese-speaking witnesses, including both victims. Additionally, one witness, the owner of the adjoining Italian restaurant, required the proceedings to be translated into Spanish. The transcript shows numerous instances of statements that had to be repeated or clarified by the court, counsel, interpreters, or witnesses. It is well established that we "'defer to the trial court's evaluation of the credibility of the witnesses who testify' before it." Harvey v. Flockhart, 65 Va. App. 131, 146, 775 S.E.2d 427, 434 (2015) (quoting Shackelford v. Shackelford, 39 Va. App. 201, 208, 571 S.E.2d 917, 920 (2002)). Such deference is even more critical where, as here, the trial court has the ability to see and hear the witness testify, but the record preserves only the interpreter's translation of the witnesses' answers.

to flee out the back door of the restaurant, she did. She then walked around the side of the building, hoping to see or call a police officer.

Jin followed Y.Y.Z. out the back door. A few moments later, the brother also left through the back door and followed Y.Y.Z. to the side of the building, where there was a wide driveway. At that point, Jin had entered his car, which was parked behind the building, and began accelerating towards Y.Y.Z. as she walked in the wide driveway. The brother pulled Y.Y.Z. out of the way, but the side mirror of Jin's car struck Y.Y.Z. in the face. The brother testified that if he had not pulled Y.Y.Z. out of the way, "she would have been dead." Jin continued driving his car toward the front of the building; Y.Y.Z. and her brother fled to the back of the building. Within a few minutes, Jin returned to the area, drove behind the building, and struck both Y.Y.Z. and the brother with his vehicle. Jin then drove his car into four one-hundred-pound propane tanks, which were connected and in use behind the building; the dislodged and scattered tanks began leaking and created a vapor cloud that engulfed the entire back half of the restaurant. Jin removed a hammer from the hatchback area of the car and entered the back door of an adjoining restaurant where Y.Y.Z. was lying injured on the floor. Jin hit Y.Y.Z. multiple times in the head with the hammer and continued to try to strike her while he was being restrained.

At trial, the brother testified he heard Jin threaten to kill Y.Y.Z. and he saw Jin attempt to run over Y.Y.Z. while she was in the driveway. He testified that he and Y.Y.Z. were struck by Jin's car, that he moved the injured Y.Y.Z. into an adjoining restaurant, and that he attempted to restrain Jin while Jin attacked Y.Y.Z. with a hammer and yelled "I'm going to kill you." The brother also testified without objection that he was Y.Y.Z.'s sibling, that he and his family lived with Y.Y.Z. in her house, that another worker in the restaurant also lived in the house, and that

Jin came back to the house "off and on" during the three years preceding the January 20, 2015 events.

During a lengthy cross-examination, Jin's counsel asked the brother, "And does your sister charge you any rent for your family to live in [her] home?" The Commonwealth objected to the question on relevancy grounds. Jin's counsel responded,

> Well, we established he's her brother. He's also an alleged victim
> of the same crime. Now, if the [c]ourt allows the question, now
> he's living in his sister's house for free and just gives him more
> incentive to put Mr. Jin away for as long as possible because that's
> a free place to live.

The court sustained the objection. Jin made no subsequent proffer and argued no other basis for admissibility of the question. In addition to Y.Y.Z. and the brother, the Commonwealth presented testimony from the brother's wife, a paramedic, a doctor, four law enforcement officers, and two bystanders.

Jin does not dispute the evidence that he struck Y.Y.Z. and the brother with his vehicle and that he struck Y.Y.Z. with a hammer. Nevertheless, he argues on appeal that the trial court violated his "constitutional double jeopardy rights" when it convicted him of two counts of attempted murder and violated his "constitutional rights when it improperly limited [his] cross-examination of [the brother] for bias."

## II. ANALYSIS

### A. JIN'S DOUBLE JEOPARDY RIGHTS WERE NOT VIOLATED BY HIS CONVICTION ON TWO COUNTS OF ATTEMPTED MURDER

Jin argues that conviction on two counts of the attempted murder of Y.Y.Z. violated his double jeopardy rights because the two attempts were part of one continuing offense. He argues that he was thereby improperly punished twice for the same offense. We disagree.

"The Double Jeopardy Clause of the United States Constitution provides that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.'" Johnson v.

- 4 -

Commonwealth, __ Va. __, __, 793 S.E.2d 321, 322 (2016) (quoting U.S. Const. amend. V).

"Subjecting an accused to multiple punishments for the same offense violates both state and

federal constitutional protections against double jeopardy." Roach v. Commonwealth, 51

Va. App. 741, 748, 660 S.E.2d 348, 351 (2008); Stephens v. Commonwealth, 263 Va. 58, 62,

557 S.E.2d 227, 230 (2002). However, "[t]he Double Jeopardy Clause is not abridged if an

accused is subjected to punishment for two offenses that are supported by separate and distinct

acts." Roach, 51 Va. App. at 748, 660 S.E.2d at 351; Hodnett v. Commonwealth, 56 Va. App.

234, 237, 692 S.E.2d 647, 648 (2010) ("A defendant may be convicted of multiple counts if he

commits separate and distinct acts."). Consequently, the issue here is whether the trial court

erred in finding that Jin's acts constituted two attempts on Y.Y.Z.'s life rather than one

continuing offense.[2]

---

[2] This Court has recognized that a defendant must raise a motion seeking dismissal of an indictment on double jeopardy grounds "in writing before trial to preserve his objection, even if the trial court may be incapable of ruling on the motion until after the defendant is convicted and sentenced." Williams v. Commonwealth, 57 Va. App. 750, 768 n.4, 706 S.E.2d 530, 539 n.4 (2011); Code § 19.2-266.2. Here, however, Jin raised his objection to a conviction for both counts of attempted murder as a part of his motion to strike the evidence. Generally, a motion to strike the evidence alleges that the "evidence is insufficient as a matter of law to sustain a conviction." Rule 3A:15. However, it is clear that in a single trial

> the state may, under one or multiple indictments, charge a
> defendant using multiple theories concerning the same crime or
> greater and lesser crimes arising out of the same act or transaction.
> In such cases, the prohibition against "multiple prosecution"
> double jeopardy does not apply so long as the defendant is
> arraigned and tried in a single proceeding.

Clagett v. Commonwealth, 252 Va. 79, 95, 472 S.E.2d 263, 272 (1996).
In such a prosecution "the double jeopardy defense does not apply unless (a) the defendant is twice *punished* for one criminal act, *and* (b) the two punishments are either for the same crime or one punishment is for a crime which is a lesser included offense of the other." Coleman v. Commonwealth, 261 Va. 196, 200, 539 S.E.2d 732, 734 (2001) (first emphasis added).
Because the evidence, in a light most favorable to the Commonwealth, unquestionably supported a conviction for either attempted murder indictment, and Jin had not yet been convicted of both offenses, a double jeopardy challenge made as a part of Jin's motion to strike

"A continuing offense is a continuous, unlawful act or series of acts set on foot by a single impulse and operated by an unintermittent force, however long a time it may occupy." Hodnett, 56 Va. App. at 237, 692 S.E.2d at 648 (quoting Thomas v. Commonwealth, 38 Va. App. 319, 324-25, 563 S.E.2d 406, 409 (2002)). "In determining whether the conduct underlying the convictions is based upon the 'same act,' the particular criminal transaction must be examined to determine whether the acts are the same in terms of time, situs, victim, and the nature of the act itself." Hall v. Commonwealth, 14 Va. App. 892, 898, 421 S.E.2d 455, 459 (1992); see also Carter v. Commonwealth, 16 Va. App. 118, 128, 428 S.E.2d 34, 42 (1993) (focusing on "factors such as the: nature of the act or acts; time; place; intent; possibility of cumulative punishment; and, number of victims" but cautioning that the list "is not exhaustive and the [fact finder] may properly consider the victim's subjective understanding of the circumstances, along with all the other evidence presented, in making this critical determination" of "whether the conduct constituted a single offense or multiple offenses").

"It is well established that an attempt is composed of two elements: the intention to commit the crime, and the doing of some direct act towards its consummation which is more than mere preparation but falls short of execution of the ultimate purpose." Sizemore v. Commonwealth, 218 Va. 980, 983, 243 S.E.2d 212, 213 (1978). "There must be some appreciable fragment of the crime committed, it must be in such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter, and the act must not be equivocal in nature." Parsons v. Commonwealth, 32 Va. App. 576, 583, 529 S.E.2d 810, 814 (2000) (quoting Lewis v. Commonwealth, 15 Va. App. 337, 340, 423 S.E.2d 371, 373 (1992)). "What constitutes an attempt is often . . . difficult to determine, and . . . no

was not appropriate. However, because the trial court considered the argument and ruled on it without objection by the Commonwealth, we will consider it sufficiently timely to preserve the issue for appeal.

general rule can be laid down which will serve as a test in all cases. Each must be determined on its own facts." Id. at 582, 529 S.E.2d at 813 (alterations in original) (quoting Sizemore, 218 Va. at 985, 243 S.E.2d at 215); see Lisenby v. Arkansas, 543 S.W.2d 30, 39-40 (Ark. 1976) ("Whether the crime or attempted crime has been completely terminated is usually a question of fact for the [fact finder] to be viewed objectively, and its end is marked by what is done, rather than what is thought."). Thus, determination of whether acts constitute a continuing offense or separate offenses is a factual finding that we will not reverse unless it is plainly wrong or without evidence to support it. See Williams v. Commonwealth, 12 Va. App. 912, 915, 407 S.E.2d 319, 322 (1991).

We find this Court's analysis in Hodnett to be instructive. In Hodnett, an inmate dipped a cupful of toilet contents out of his cell's unflushed toilet and intentionally threw the contents onto a prison guard. Hodnett, 56 Va. App. at 236, 692 S.E.2d at 647. Within seconds, before the guard had a chance to leave, the inmate dipped a second cupful of toilet contents and threw it on the prison guard. Id. The inmate was convicted of two counts of assault and battery on a law enforcement officer. Id. He contended that the trial court erred in finding two separate offenses because the two attacks on the guard were one single continuing offense. Id. This Court recognized that the issue was "whether the two [attacks] were each a separate, complete act, or whether the second was a continuation of the first." Id. at 237, 692 S.E.2d at 648. This Court reasoned that each attack was a separate act because the second attack, "though in temporal proximity, was not a continuation of . . . the first. It did not involve continued motion." Id. Further, the second attack "involved a new formation and execution of purpose." Id. at 238, 692 S.E.2d at 648. Consequently, this Court held that the evidence supported the trial court's finding of fact that two separate, complete acts had been committed. Id.

The issue here, as in Hodnett, is "whether the two [attacks] were each a separate, complete act, or whether the second was a continuation of the first." Id. at 237, 692 S.E.2d at 648. Jin argues the trial court erred by finding two separate attempts at murder. We disagree.

## 1. Each Attempt Was a Separate, Complete Act

Here, each of Jin's attacks on Y.Y.Z. can stand on its own as a separate, complete attempt to murder Y.Y.Z. During the first attack, Jin accelerated his car and aimed the vehicle directly at Y.Y.Z. even though, as the trial court found, he could have driven around her. The brother testified that if he had not pulled his sister back then she "would have been dead" instead of only being hit in the face with the side mirror. Consequently, Jin's acceleration of his car toward Y.Y.Z. was a direct, unequivocal act toward the commission of murder, which fell short of murder only because the brother intervened. If the events of January 20, 2015, had ended then, Jin could have been charged with attempted murder. It was not error, therefore, for the trial court to conclude that Jin's first attempt to murder Y.Y.Z. was complete when he drove away and Y.Y.Z. ran towards the back of the building.

Likewise, it was not error for the trial court to find that Jin's attack on Y.Y.Z. with a hammer was a separate attempt to murder her. Several witnesses testified Jin hit Y.Y.Z. in the head with a hammer while she was lying injured, and he continued to try to strike her while being restrained. The trial court did not err in concluding that Jin's act of repeatedly hitting Y.Y.Z. in the head with the hammer was a direct, unequivocal act toward the commission of murder, which fell short of murder only because bystanders intervened to restrain him. Had this been Jin's only act on January 20, 2015, Jin could have been charged with attempted murder. Each attack thus independently met the requirements of an attempted murder.

## 2. The Second Act Was Not a Continuation of the First

Nevertheless, Jin argues that the second act was a continuation of the first act, thereby constituting one continuing offense. We disagree.

In analyzing whether the evidence here supported the trial court's finding of two separate acts, we look at "whether the acts are the same in terms of time, situs, victim, and the nature of the act itself." Hall, 14 Va. App. at 898, 421 S.E.2d at 459. Here, as in Hodnett, the victim was the same in both attacks. However, the other factors support the finding that Jin's second act, hitting Y.Y.Z. in the head with a hammer, was not a continuation of the motion involved in the first act, hitting Y.Y.Z. with his car. In Hodnett, the two attacks occurred so quickly that the guard did not have time to turn and leave. Hodnett, 56 Va. App. at 236, 692 S.E.2d at 647. Here, the two attacks, though occurring close in time, were nonetheless separated by the time it took Jin to turn his car around, drive to the back of the building, drive into four large propane tanks, retrieve a hammer from the back of his vehicle, and enter an adjoining restaurant. Furthermore, unlike Hodnett, the two attacks here differed in location and method. The first attack occurred beside the building in the driveway; the second attack occurred inside an adjoining restaurant at the rear of the building. The first attack was Jin's attempt to run over Y.Y.Z. with his car, and the second was a more vicious, hands-on attempt to bludgeon Y.Y.Z. with a hammer. The hammer attack did not involve a continuation of the motion involved in trying to run over Y.Y.Z. with a vehicle. Instead, the hammer attack "involved a new formation and execution of purpose." Id. at 238, 692 S.E.2d at 648. When Y.Y.Z. was inside the adjoining restaurant, Jin had to formulate a new method of attacking her and had to acquire a new tool, which was not within his immediate reach, to utilize that method. Under the reasoning of Hodnett, the second attack was not a continuation of the first, and trial court did not err in finding that Jin's attacks constituted two separate murder attempts.

In summary, each act by Jin, in and of itself, was an attempt to murder Y.Y.Z. Each attempt to kill Y.Y.Z. was a direct act toward consummation of murder that fell short of the crime because of the acts of bystanders. The two acts occurred in different locations and were perpetrated by different means, with a short break of time between the two. Each act resulted in separate injuries to the victim. The evidence supported the trial court's express finding that the two attacks were separate attempts on Y.Y.Z.'s life, rather than one continuing offense. Jin should "not be rewarded where, instead of taking advantage of an opportunity to walk away from the victim, he voluntarily resumed his . . . assaultive behavior." Carter, 16 Va. App. at 129, 428 S.E.2d at 42. Consequently, the trial court did not err in concluding Jin's double jeopardy rights were not implicated.

### B. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY LIMITING JIN'S CROSS-EXAMINATION OF THE BROTHER

Jin argues that the trial court erred in sustaining the Commonwealth's objection to a question during cross-examination. Specifically, Jin asked the brother, "And does your sister charge you any rent for your family to live in the home?" The Commonwealth objected based on the ground of relevancy. Jin argued to the trial court that the brother was "living in his sister's house for free and [that] just gives him more incentive to put Mr. Jin away for as long as possible because that's a free place to live." Neither prior to the trial court sustaining the objection nor in a subsequent proffer did Jin argue to the trial court that Jin had authority to limit who could stay in Y.Y.Z.'s home. Nevertheless, Jin argues that the trial court erred in preventing him from asking this one question because the brother's free rent showed his bias and a motivation to fabricate his testimony. We disagree.

"[W]e review a trial court's decision to admit or exclude testimony using an abuse of discretion standard." Commonwealth v. Proffitt, ___ Va. __, __, 792 S.E.2d 3, 6 (2016) (quoting Harman v. Honeywell Int'l, Inc., 288 Va. 84, 97, 758 S.E.2d 515, 523 (2014)).

- 10 -

"Cross-examination of prosecution witnesses 'is "fundamental to the truth-finding process and is an absolute right guaranteed to an accused by the confrontation clause of the Sixth Amendment."'" Maynard v. Commonwealth, 11 Va. App. 437, 444, 399 S.E.2d 635, 639-40 (1990) (*en banc*) (quoting Williams v. Commonwealth, 4 Va. App. 53, 77-78, 354 S.E.2d 79, 93 (1987)).

> It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). While the "bias of a witness is always a relevant subject of inquiry when confined to ascertaining previous relationship, feeling and conduct of the witness," a trial court nonetheless "has discretion to limit the scope of cross-examination which is for the purpose of establishing bias." Norfolk & W. Ry. v. Sonney, 236 Va. 482, 488, 374 S.E.2d 71, 74 (1988) (citation omitted); Jackson v. Commonwealth, 266 Va. 423, 438, 587 S.E.2d 532, 543 (2003) ("[The] limitation of cross-examination is within the trial court's discretion.").

Here, Jin cross-examined the brother and was free to "ascertain[ his] previous relationship, feeling and conduct." Sonney, 236 Va. at 488, 374 S.E.2d at 74. Jin exercised his right to cross-examine the brother on a wide range of subjects, including the living arrangements of Y.Y.Z. and the brother's family. Jin cross-examined the brother regarding his testimony that his family had been living with Y.Y.Z. since at least 2011, when Jin and Y.Y.Z. separated, and his testimony that he, his wife, and Y.Y.Z. worked in Y.Y.Z.'s restaurant.

Jin suggests that the brother might fabricate his testimony in order to keep his current living arrangement. However, testimony already had established that the brother and his family had been living with Y.Y.Z. for several years, that the brother and Y.Y.Z. were siblings, that the brother and his wife worked for Y.Y.Z., and that the brother was injured by Jin in the January 20, 2015 incident. The additional testimony regarding whether the brother paid Y.Y.Z. rent was, at most, "only marginally relevant," Van Arsdall, 475 U.S. at 679, to show potential bias on the brother's part.

"[W]hile a factfinder may 'draw reasonable inferences from basic facts to ultimate facts,' the inferences cannot become so attenuated that they 'push "into the realm of *non sequitur*."'" Bowman v. Commonwealth, 290 Va. 492, 500, 777 S.E.2d 851, 857 (2015) (first quoting Jackson v. Virginia, 443 U.S. 307, 319 (2015), then quoting Thomas v. Commonwealth, 48 Va. App. 605, 608, 633 S.E.2d 229, 231 (2006)). Jin proffered no evidence from which a fact finder could reasonably infer that the living arrangements between Y.Y.Z. and her brother would be affected if Jin was not "put away." The only inference that Jin presented to the trial court to support the relevancy of the question was that the brother was biased because he was living rent free at his sister's house; this is simply too attenuated to be more than marginally relevant. Therefore, it does not rise to a violation of the Sixth Amendment right to cross-examination.

The trial court permitted Jin wide latitude in cross-examining the brother to show bias. The trial court, in its discretion, imposed a reasonable limit when it denied one question regarding the brother's payment of rent to Y.Y.Z. Accordingly, the trial court did not abuse its discretion when it sustained the Commonwealth's objection on relevancy grounds. See Van Arsdall, 475 U.S. at 679.

## III.  CONCLUSION

The trial court did not err in finding that Jin's attacks on Y.Y.Z. constituted two separate attempts.  Additionally, the trial court did not abuse its discretion when it limited Jin's cross-examination of the brother.  We therefore affirm Jin's convictions.

<u>Affirmed.</u>